## GERMAN-AMERICAN INSURANCE CO. VS PAUL.

## Opinion delivered October 19, 1904.

1. *Fire Insurance—Title to Property—In Indian Nation—Estoppel.*

   A policy or contract of fire insurance written upon property in the Indian Territory at a time when, under Secs. 2116, 2118 Rev. Stat. U. S. land therein was not subject to individual ownership contained a provision that same should be void if the building insured should be upon land not owned in fee by the assured. *Held,* that such provision was a nullity and the insurance company is estopped from claiming a forfeiture thereunder.

2. *Fire Insurance—Proof of Loss—Verification—Waiver.*

   After a loss by fire of property covered by a policy containing a requirement that verified inventory as proof of loss to be furnished within sixty days, the assured, within that time furnished an unsworn inventory and the company's agent stated it was all right. Later the company refused to waive the requirements of policy and claimed the proof to be insufficient, and failed to return the unsworn proof, as requested, in time to enable the assured to verify same within the required time. *Held,* that the Company thereby waived the requirement as to proof of loss.

3. *Evidence—Husband and Wife.*

   A divorced wife cannot testify, against her husband, as to communications made by her to her husband while the marriage relation subsisted; and where objection was made on this ground and counsel offering the testimony made no statement showing that her testimony would be to other facts that might have been competent, it will be presumed that the testimony related to such inadmissible communications and was properly excluded.

Appeal from the United States Court for the Northern District.

JOSEPH A. GILL, Judge.

Action by Joseph Paul against the German-American Insurance Company.   Judgment for plaintiff.   Defendant appeals. Affirmed.

This was an action brought by appellee for the recovery of a loss by fire upon a policy of insurance executed on August 6, 1894, by the appellant insurance company, upon a dwelling house situated and built on lands belonging to the Cherokee Nation, and the furniture, etc., therein contained.   The plaintiff, the insured, was a white man, and not a citizen of the Cherokee Nation.   He claimed to own the premises and furniture by virtue of a gift from his wife, who was a Cherokee Indian.   The fire which destroyed the property occurred on September 30, 1894, and the loss was total.   During the first week of October of the same year the plaintiff, at the request of Mr. Will I. Drumm, defendant's adjusting agent, made out an inventory of the property destroyed by the fire, with its value.   This was not sworn to, but when handed to Drumm he said, "This will do."   The plaintiff, relying upon the inventory aforesaid, as being sufficient, waited until the 60 days given by the terms of the policy for the making of the sworn statement had nearly expired, and, not hearing from the company, became apprehensive that they were going to rely upon technicalities to defeat his claim, and then employed Mr. Burkhalter, an attorney at law at Vinita, to look after the matter.   Mr. Burkhalter at once wrote Mr. Drumm to know if the company would waive the requirements of the policy requiring a sworn statement of the loss.   A few days thereafter— November 19th—Mr. Drumm replied that he would not, and stated that "there is no one, excepting the president and secretary of the company, who can in any manner change or alter the conditions of the policy."   Mr. Burkhalter then wrote him November 26th to return the inventory already furnished by the

plaintiff, so that Mr. Paul could at once swear to it; also informing Mr. Drumm that Paul had understood that he (Drumm) had accepted the one already furnished.    There was no answer to this letter, and the inventory was not returned.    On December 3d, Mr. Burkhalter again wrote Mr. Drumm, informing him that he had been employed by plaintiff, and asking to know what the company intended to o about the claim.    To this letter Mr. Drumm replied on December 8th, expressing his surprise that such a question should be asked, and admitting that he had received the letter of November 26th, asking for the return of the inventory. He uses the following language:   "Now, on Nov. 26th, you asked me to return a list of goods made by Mr. Paul, and further state that Mr. Paul supposed that by furnishing me with a list was all that was necessary in making proof.    Now I would ask as a business proposition, and as you are an attorney at law, how you reconcile the two letters?    In your former letter asking me to waive requirements of the policy pertaining to proofs, and in your next letter advise me that you supposed the list furnished was sufficient proof of loss.    I must say that this would not do credit to an ordinary business man, much less to an attorney at law.    Now, in conclusion I wish to state that as you have the contract in your possession, that that would certainly suggest the method to pursue."    On January 10, 1895—40 days after the time for filing proof had expired—Mr. Burkhalter inclosed to Mr. Drumm a sworn proof of the losses.    On January 14th, Mr. Drumm, replying to the letter of the 10th, says:   "Your favor of the 10th inst., containing what is purported to be proofs of loss in the matter of Joseph Paul, under German American policy No. 567, of the Vinita, I. T., agency, duly received, and in reply beg to say, as I have previously stated, that we stand squarely on our contract, hence I return said paper purporting to be proof of loss herewith, as the time for making proof, 60 days, has undoubtedly gone by."    On February 25, 1895, Mr. Eugene Cary, manager for

the company, wrote to Mr. Burkhalter from Chicago, as follows: "We have your favor of the 20th inst., in reference to claim of Joseph Paul under our policy No. 567, issued at our Vinita, I. T., agency, and have given careful consideration to contents. We had previously received the correspondence between yourselves and our Mr. Drumm, and cannot find that Mr. Drumm has done anything in the premises to be criticised. Touching his failure to furnish you with blank proof of loss, we have to say that these blanks are provided for the convenience of our own special agents in the adjustment of losses, and we are not required to furnish them to assured parties, and never do so except where a loss has been satisfactorily agreed upon and the liability of the company determined and adjusted. The policy points out clearly what is required of an insured party in the premises, and he neglects observance of these requirements at his own peril. We have no proposition to make in the case, but are prepared to receive any that you or your client may have to offer, not waiving any of the company's rights in the premises." The first proof of loss—the unsworn one—was not offered in evidence by plaintiff, it not being in his possession; and the defendant did not offer it, nor deny by the proof that it was in full compliance with the requirements of the policy as to proof of loss, except that it was not sworn to. The case was tried to a jury, and at the conclusion of the proof each of the parties requested a peremptory instruction for a verdict. Both were refused by the court, and exceptions saved. The verdict was for the plaintiff, and the cause regularly appealed by defendant.

*Hutchings, West & Parker,* and *D. H. Wilson,* for appellant.

*Don Carlos & Henderson, Preston S. Davis,* and *Wade S. Stanfield,* for appellee.

CLAYTON, J.   The appellant assigns ten specifications of error.   They are all embraced in the three following propositions, as set out in appellant's brief:   "First.   That the property insured was not owned by the plaintiff (appellee).   Second. That no sufficient proof of loss was furnished, and the failure was not waived by the company's agent.   Third.   Mrs. Paul (the divorced wife of plaintiff) should have been allowed to testify."

As to the first proposition:   One of the provisions of the policy of insurance sued upon is:   "This entire policy shall be void if   *   *   *   the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building on ground not owned by the insured in fee simple." The answer, by way of defense, sets up the above condition of the policy.   It is claimed by the defendant:   First, that the ownership of the building and a material part of the furniture covered by the policy was not in the plaintiff, but that it belonged to his wife; second, that the plaintiff, being a white man, and not a citizen of the Cherokee Nation, it was not possible, under the laws and treaties of the United States and of the Cherokee Nation, for plaintiff to own the fee in Cherokee lands, and therefore he did not own it.   Plaintiff's wife was a Cherokee, and he testified that at the time they were married, a short time before the burning, his wife gave him the property.   There were some pretty strong circumstantial facts proven which tended to show that she had not done so, but this question was submitted to the jury on a charge of the court which fairly and plainly presented the question, and was not objected to by either of the parties on that point, and the jury found against defendant's contention.   In our opinion, the proof of ownership of the property by the plaintiff as against his wife was sufficient to justify the court in presenting this question to the jury.

On the point that the Cherokee Nation owned the fee, and that the plaintiff did not, and, therefore, that the condition of the

policy above set out which rendered it void existed, there is no doubt; and unless, under the circumstances of this case, the defendant was estopped from setting it up as against the plaintiff, it must prevail in this suit. The lands of the Five Civilized Tribes of the Indian Territory, including those of the Cherokee Nation, at the time of the execution of the policy in this case, were "public lands, and not held in individual ownership." Stephens vs Cherokee Nation, 174 U. S. 448, 19 Sup. Ct. 722, 43 L. Ed. 1041. The fee-simple title to them was in the tribes, and not in individual Indians. Under the law as it then existed no individual Indian or white man could hold the fee-simple title to any part of them, either in the cities and towns or elsewhere. And this condition existed, not because of the constitution and laws of the different tribes which forbid it, but because of the conditions of the grants to the tribes, executed by the United States, pursuant to a public act of Congress and the treaties, which have the effect of statute law. By the provisions of an act of Congress approved June 30, 1834, c. 161, 4 Stat. 730, § 12 (section 2116, Rev. St. U. S.), it was provided that: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of one thousand dollars." And by the same act (section 2118) it was provided that: "Every person who makes a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey such lands, or to designate any of the boundaries by marking trees, or otherwise, is liable to a penalty of one thousand dollars. The President may, moreover;

take such measures and employ such military force as (he) may judge necessary to remove any such person from the lands." And up to the passage of the act of June 28, 1898, c. 517, 30 Stat. 495, entitled "An act for the protection of the people of the Indian Territory, and for other purposes"—nearly four years after the execution of the policy of insurance sued on in this case —the United States had not given its consent, by treaty or otherwise, to the Cherokee Nation to alienate any of its lands; and therefore, by public law, known to all of the parties to this suit, it was impossible for any white man or individual Indian to own the fee to any land in the Cherokee Nation.    Hence, if it be true that this impossible stipulation rendered the whole policy void, when this company came into the Indian Territory seeking the business of its people, and in exchange for the premium paid to it presented to them such a policy, knowing that it would bind them to no duty, and imposed upon them no obligation, should it not, in good conscience, either have run the pen through this printed stipulation, or have refused altogether to issue the policy?    This was most assuredly its duty, and, having failed in it, and having made no effort to return the premium, the company is now estopped from setting up this clause as a defense.    The probable truth is that the parties considered it as a nullity.    That the defendant so regarded it we gather from the following somewhat apologetic statement of the company's counsel in their brief. They say:    "This question, as a matter of fact, should have been taken from the jury entirely, because, as we contend, under the unmistakable proof, this plaintiff could not have been the owner under any circumstances of improvements on the public domain of the Cherokee Nation.    This is no effort to get around, upon a technicality, the payment of a just and proper loss of property destroyed, which was situated upon the public domain of the Cherokee Nation.    The peculiar conditions existing at that time in the territory were well known to the insurance companies, and they wrote insurance in the light of the knowledge of these condi-

tions; and not any one of them has ever at any time attempted to avoid the payment of a policy honestly obtained and written upon improvements properly owned upon such public domain." If the peculiar conditions existing at the time in the territory were well known to insurance companies, and they wrote insurance in the light of the knowledge of those conditions, can they now be heard to say that they have been misled to their injury by a retention in the policy of a clause known to them at the time to be totally inapplicable and inconsistent with those conditions, and one which, if retained in their policies, would absolutely prevent them from doing any legitimate business in this territory? This policy was printed by the company. It was one of their usual forms. They put in the impossible clause. It was an instrument prepared by them, and presented to the insured with the implied understanding, at least, that it was correct, and not a mere invitation to folly, or a bid for money without consideration. The clause was for their benefit. They received the premium, and have made no tender of it back to plaintiff. Under such circumstances the company is estopped to set up the clause of the policy creating the forfeiture. The contention now made by the company resolves itself into this: "We are a fire insurance company. We desire to do business with the people of the Indian Territory. Under the law of this territory no person can hold the fee-simple title to the lands upon which their buildings stand. Our printed form of policy contains a provision that the assured must be the owner of the land in fee simple, and, if not, he forfeits all rights under it. We must, therefore, either change our form of policy, or present to the people of that territory one void as to them, and, because of our superior knowledge of the fact, fraudulent as to us; but, notwithstanding this fact, we will insure under them, and in case of loss we will honestly pay it" (an admission that you did not rely on it, and one which strikes it out of the contract) "or we will retain the premium, and not pay the loss" (an admission of fraudulent intent, which estops

you from setting up the forfeiture clause as a defense).   So, in either event, the policy must be construed as if the provision had not been written into it.   The very statement of the proposition condemns it.   No reason can be given, and the defendant company has not attempted it, why, as to the policies intended to be used in the Indian Territory, such a provision should have been inserted in them.   They might as well have required that the insured should have had a fee-simple title to Paradise, or Hades, as the one inserted.   Both would be considered by the courts as irrelevant to the contract, and immaterial, and of no binding effect.

The next contention of the appellant is that no sufficient proof of loss was furnished, and the failure was not waived by the company's agent.   The proof clearly shows that no proof of loss, sworn to as provided by the policy, was presented to the company, until about 40 days after the time provided by the terms of the policy—60 days after the fire—had expired.   But a few days after the burning, Mr. Drumm, the company's adjusting agent, who lived at Topeka, Kan., came to the place, and saw the plaintiff, and, after inspecting the burned premises, said to him, "You must make me out an invoice of the loss;" and this the plaintiff did, but did not swear to it.   He first took it to Mr. Ratcliff, the local agent, who had procured the insurance for the company, and offered it to him, but Ratcliff told plaintiff to take it to Mr. Drumm, who was in an adjoining room.   This he did. Mr. Drumm received it without objections, saying, "This is all right, but I have got to consult the company before I can settle with you."   This declaration of his is testified to by plaintiff, and nowhere denied by defendant.   That he received this proof of loss is admitted by him in his letter to Mr. Burkhalter of December 8,1894.   No objection is made to this proof of loss, either in the correspondence or at the trial, except that it was not sworn

to. Indeed, in the correspondence no objection is made to it on that or any other specific grounds. The plaintiff, relying on this as being sufficient, waited until he became apprehensive that the company would not pay his losses, and then employed Mr. Burkhalter, an attorney at law, to look after the matter, whereupon the correspondence briefly set out in the statement of facts occurred. The time of Mr. Burkhalter's employment is not stated, except he says that it was but a short time before the time for making proof expired. From the date of the commencement of the correspondence, it must have been about November 15th, which would have been 15 days before the expiration of the time. His first letter requested to know if the company would waive the requirement of the policy relating to proof of loss. On the 19th Mr. Drumm replied that he would not. On the 26th Mr. Burkhalter wrote, demanding a return of the proof that had already been furnished, that it might be sworn to. There was no answer to this letter, and no other correspondence until after the expiration of the time for furnishing the proof of loss. By the 10th of January, 1895, Mr. Burkhalter had prepared another proof of loss, duly sworn to, which he mailed that day. On the 14th day of January, 1895, this was returned, with the information that "the time for making proof, 60 days, has undoubtedly gone by." But the first proof of loss was not returned. We think that the request for the return of this paper for the purpose of perfecting it was a reasonable one, and, as the time for doing it was so nearly past, it was the duty of the company's agent to have returned it, and to have done it promptly, especially so as he had once pronounced it "all right." The delay in getting a proof of loss that was not objectionable on the ground that it was not sworn to, was altogether the fault of the company, and when that is the case it cannot be heard to complain. If the action of the agent, Mr. Drumm, in receiving the first proof and pronouncing it "all right," and his after-conduct, was not to be considered as a waiver by the company of the defect for all time, it certainly

was up to the date of his letter of November 19th, when, in response to Mr. Burkhalter's request to know their intention, he informed him for the first time that the company would not waive proper proof; and this, allowing for the time taken for the letter's transmittal by the mails, only left about eight days in which to make the proof.   Considering the shortness of the time and the fact that the plaintiff had been lulled to inaction by the words and conduct of defendant's agent, together with the fact that the only defect complained of was that the paper was not sworn to, in all fairness it ought to have been returned at that time, without waiting for a demand; and when the request was made the plaintiff's counsel had the right to believe that it would be respected.   But it was not, and it was too late to prepare another within the prescribed time.

"In an action on a policy, when the company relies on the defect in proof of loss, the burden is on the company to show that it notified the assured of such defects within reasonable time." Killips vs The Putnam Fire Ins. Co., 28 Wis. 472, 9 Am. Rep. 506. The policy in the above case contained a clause limiting the right of action thereon to 12 months after the loss.   The court held the clause valid, but said:   "But the stipulation might be modified or waived by the parties, or the company might be estopped by its own acts from claiming the benefit thereof.   Where, by any act or omission of the responsible officers and agents of the company, the insured is induced to suspend, for a certain length of time, the performance of acts required on his part after a loss, such time should not be reckoned as a part of the period to which the right of action is limited."   After stating the facts, the court proceeds to say:   "These facts had a tendency to prove that plaintiff was induced by the conduct of said general agent to suspend the making and furnishing of his second proofs for a period equal to that between the end of twelve months and the commencement of his action (about fourteen weeks), and, if the

jury so found, a verdict for plaintiff would not be set aside merely because the action was not commenced within the time limited." In the case of Troy Fire Ins. Co. vs Carpenter, 4 Wis. 39, the court say: "If the notice had not been given in time, or if the proofs furnished were insufficient, the secretary should have apprised Carpenter of it, so that the defect might have been obviated or supplied. Ought the company to be permitted to object to the notice or the proofs after their agent has informed the insured that he was satisfied with them?"

In this case the fire occurred September 30, 1894. The 60 days allowed by the policy for proof of loss expired on November 29th, and 42 days thereafter,—January 10, 1895—the second proof of loss, properly sworn to, was mailed to the company's agent. No objection was made to the proof furnished by plaintiff to the company's agent on October 3d until November 19th, the date of Drumm's letter to Burkhalter, a delay of 47 days; and therefore, according to the rule laid down in the case of Killips vs Putnam, supra, deducting from the time allowed by the policy the time that plaintiff was delayed in making proof of loss caused by the fault of defendant, the second proof was clearly within the time allowed by the law, under the circumstances of the case. But the plaintiff does not have to rely upon that, because the refusal to return the first proof of loss, which, as before stated, had been received with the assurance that it was "all right," in our judgment was a waiver on the part of defendant of the defect in its execution. "The detention of proofs for thirty-eight days, with knowledge of defect, without making objection, will sustain a finding that the proofs were accepted as sufficient, and of waiver." Keeney vs Home Ins. Co., 71 N. Y. 396, 27 Am. Rep. 60. "Delivery of proof to the local agent and retention by him without objection is a waiver, although the policy provides that the proofs shall be furnished at the home office." German Ins. Co. vs Ward, 90 Ill. 550. "The formal proofs of loss required by

a policy of insurance may be waived, and when a party acts in accordance with the instructions of an agent, who has assumed to make investigations, he cannot be required to do more." Security Ins. Co. vs Harrison S. Fay, 22 Mich. 467, 7 Am. Rep. 670. In this case Mr. Drumm had visited the place of the fire, and had made his investigation, and directed the plaintiff to make an "inventory" of the things destroyed, and hand it to him. Pursuant to that direction, a paper, containing a list of the property, with its estimated value, was handed to him, and he was satisfied with it, as evidenced by his declaration that, "It is all right, but I cannot settle with you until I see the company." · "The notice or proof required by the policy, or any part thereof, or any requirement with regard thereto, may be waived by the company, even though there be a provision in the policy that no waiver of modification of any of its terms or conditions shall be made in any event; or it may, by its conduct or declarations, which lead the insured to believe that it will not insist upon the enforcement of such requirements, or which prevents him from complying therewith, be estopped to assert them. Thus, where the proofs of loss are delivered to the agent, who asserts that the company is not liable, all objections to the proofs are thereby waived. Likewise questions as to the sufficiency of the proof are waived by the examination of the premises by the company's authorized agent, who investigates the loss, and refuses to pay it. So the company is precluded from denying the receipt of proper notice of the loss where its agent has adjusted it. So, also, if the insurance company makes no specific objection to the form, sufficiency, or absence of notice of proofs of loss, but declines payment upon other grounds. It may be presumed to have waived defects in or the absence of notice of proof. Again, holding the proofs furnished for an unreasonable length of time without objecting to them may amount to a waiver." Phoenix Ins. Co. vs Taylor, 5 Minn. 492 (Gil. 395). "The applicant, unused to the business, and ignorant of what is necessary to be done, trusts to the skill,

knowledge, and judgment of the agent, and puts full confidence in and relies upon him to see that the business is correctly done; and, if he acts honestly and in good faith, the company ought to be charged with a knowledge of all the facts that are known to the agent; that it would be unjust to the insured, after he has made the application and paid the premium demanded and the expenses of the policy, to permit the company, upon destruction of the property, to say that they will not make good the loss, because their agent, whom they have authorized to act for them, has failed in the performance of his duty; and that, as the agent knows the requirements of the company and the insured does not, if the application or policy be defective upon a point well known to the agent, the company, and not the insured, should be the sufferers." Campbell vs The Merchants' & Farmers' M. Fire Ins. Co., 37 N. H. 35, 72 Am. Dec. 324. Numberless authorities might be cited to the same effect. And this question of waiver was properly presented to the jury by the charge of the court in all of its different phases. The court did not err in submitting this question to the jury, and the proof was amply sufficient to sustain the jury's verdict for the plaintiff on this point.

The next and last proposition is that Mrs. Paul should have been allowed to testify. Mrs. Paul was the divorced wife of plaintiff. The proceedings in relation to the court's action in declaring her disqualified as a witness were as follows: "By Mr. Hutchings: If the court please, we offer in evidence the testimony found in transcript of Julia A. Barbee, the divorced wife of the plaintiff in this case, she having been divorced from him a short time after the fire occurred for which this action is brought. By Mr. Davis: The plaintiff objects to the introduction of this evidence upon the ground and for the reasons that at the time this fire occurred, as shown by the evidence, this witness was the wife of the plaintiff, and that under our statute, which is in force here, that the wife cannot testify in any case for or against her

husband. The testimony is incompetent and inadmissible under the statute and under the law upon the subject of a wife testifying in any action for or against her husband without the consent of the husband, and we object to it upon that ground. By the Court: The objection will be sustained. (To which ruling of the court counsel for the defendant at the time duly excepted and excepts.)" After other proceedings, the offer of this witness was renewed by Mr. Wilson, Mr. Hutching's co-counsel, as follows: "By Mr. Wilson: We desire to introduce the testimony of Julia Paul, nee Barbee, divorced wife of the plaintiff, being the testimony given by her heretofore at the trial of this case, she being now out of the jurisdiction of this court, as follows: By Mr. Stanfield: The plaintiff objects to the testimony on the ground that the witness Mrs. Paul, nee Barbee, is the divorced wife of the plaintiff, and that the testimony related to and concerns communications made by her to plaintiff during the marriage, and that she is an incompetent witness. By the Court: Objection is sustained for the reason that the testimony —to communications made by Mrs. Paul, nee Barbee, to her husband, while they were married, and that she is incompetent to testify concerning any communication made to her husband while the marriage relation subsisted. Mr. Wilson: The defendant excepts to the ruling of the court." This is all that the record discloses as having occurred in court in relation to the matter. What the testimony of Mrs. Paul would have been is only disclosed in so far as stated by plaintiff's counsel Mr. Stanfield that "it related to and concerns communications made by her to plaintiff during the marriage." This was not denied by defendant's counsel. And the court's ruling was solely upon that ground. And it was correct. If the witness would have testified to any relevant fact that, notwithstanding the marriage relation, would have been competent, it was the duty of defendant's counsel to have called the court's attention to it, and ob-

tained its ruling upon it, and to have then saved their exceptions. This was not done.

Finding no error in the proceedings of the court below, its judgment is affirmed.

RAYMOND, C. J., and TOWNSEND, J., concur.